No. 36,236

In re Condemnation of Land (WILLIAM L. SCHAMP et al., *Appellees,* v. THE CITY OF WICHITA, *Appellant).*

(159 P. 2d 402)

Opinion filed June 9, 1945.

*Vincent F. Hiebsch* and *K. W. Pringle,* both of Wichita, argued the cause, and *O. W. Helsel,* of Wichita, was on the briefs for the appellant.

*Dale M. Bryant* and *Morris H. Cundiff,* both of Wichita, argued the cause for the appellees.

The opinion of the court was delivered by

HARVEY, C. J.: This was an eminent domain proceeding by which the city acquired for municipal airport purposes a tract of 151 acres of land owned by the Schamp family. They appealed from the award of the condemnation commissioners, filed May 15, 1943, to the district court, where there was a jury trial which resulted in a judgment in their favor. The city has appealed and argues: (1) That the court admitted incompetent, irrelevant and immaterial evidence and refused to strike the same on motion; (2) that the verdict and judgment are based on speculative testimony as to value, for

which reason the city's motion for a new trial should have been granted. The location of the land involved, the municipal airport, the improvements made thereon, and the industries nearby, are best shown by the accompanying plat.

Beginning about 1928 the city established a municipal airport and acquired section 12, shown in the plat, for that purpose, and since then has improved the property and enlarged it by acquiring additional lands in sections 1, 6, 7 and 13, so that it contains about 1,500 acres, and has made of it a large, well-equipped airport. At some time, not definitely stated, two airplane manufacturing companies established factories near the airport. The Cessna Aircraft

Company located its plant on the northeast quarter of section 1, and later acquired for its use the north half of section 6. The Boeing Airplane Company located its first plant on the northeast quarter of section 11 adjacent to the airport, and later its second plant south of the first one in the same section, and also acquired forty-five acres in section 14 for warehouse purposes. Beginning about 1940 these factories have been greatly enlarged. We were told at the argument the Boeing has more than 20,000 employees. Housing facilities for employees of the plants were provided by building on section 2 a city known as "Planeview." A two-lane cement highway, known as George Washington boulevard, was built from the city southeasterly to the municipal airport and the Boeing plant. There is a north-and-south street west of the airport paved thirty feet wide with asphalt, which is intersected at the southeast corner of section 11 by an east-and-west highway paved with cement west to the four-lane highway shown on the plat, and to the east is a graveled road extending along the north line of the Schamp land. There was regular bus service from the business part of the city of Wichita to the airport and to each of the airplane factories. Natural gas, electricity, city water and sewer had been provided for Planeview, the airport and each of the airplane factories, but these facilities had not been extended to the Schamp land. The above states the general situation early in 1943 when the city acquired the land in question.

In the district court the landowners, whom we shall refer to as plaintiffs, contended that the most advantageous use for which the land taken was adaptable was for industrial or commercial purposes, while the city, which we shall refer to as defendant, contended that its most advantageous use was for farming or dairying. It had previously been used for farming purposes. To sustain their contention plaintiffs called as a witness L. E. Watson, who testified that he was engaged in the real estate business in Wichita and had been since 1916; that he was familiar with the Wichita municipal airport; that he sold to the Cessna Aircraft Company, about 1929, the first land purchased for a factory site in the vicinity of the airport; that he bought for the Boeing people the land for their factory No. 2 site, and also the forty-five acres for its warehouse; that he had acted for the city in purchasing land in sections 7 and 13 for the enlargement of its airport; that he was familiar with the development of the airport and factory sites about it and with the

value of land adjacent to or near the airport, and gave it as his opinion that the plaintiffs' land was worth $250 per acre in May, 1943; that it was well adapted for industrial or commercial use, and a purchaser might have appeared at any time wanting the land for such purposes. He fixed the value of the land for farming purposes alone at $125 per acre, but stated it was worth much more for industrial use.

E. R. Shaffer testified that he was a farmer and township trustee; that he lived a half mile east of plaintiffs' land, was familiar with it, had lived there for twenty-five years; that he had seen the development of the airport and the factory sites about it, that he knew prices paid or asked for land in the vicinity, and that in his opinion the land was worth $250 per acre; that the most valuable use for which it was adapted was for factory sites, also that it might be used for warehouses or railroad terminals.

Hobart Brady testified that he had taken educational work in appraising and determining land values, was a senior member of the American Institute of Real Estate Appraisers, admission to which is governed by a minimum of ten years practical experience in appraising, together with an examination and recommendation; that he was a member of the Urban Land Research Institution for the study of such property for utilization of land for industrial and commercial purposes; that he was a mortgage loan correspondent for an eastern life insurance company, which made loans on industrial plants and in that capacity made appraisement of the property on which the loans were made; that he had acted as an appraiser under appointment from the federal court for such properties; had frequently appraised industrial property for the Missouri Pacific and Santa Fe railways; made similar surveys on behalf of the buyers for the Safeway Stores and Montgomery Ward; that he specialized in industrial and commercial real estate, and that he had made appraisals on three aircraft plants, which were named; that he had been engaged to make an appraisal, as of May 15, 1943, of plaintiffs' land to determine its fair market value as of that date; that he had examined the land, and he gave it as his opinion that it was then of the value of $237.50 per acre, or a total of $35,625; that in making this appraisement he investigated prices paid for the land in the vicinity of the airport and the volume of traffic in and out of the airport, and examined the studies made by Bartholomew Associates relative to Wichita's future population growth; had

investigated factors which would induce industries to locate adjacent to the airport, the factor of physical limitation of the land which had such adjacency value; that he considered the highest and best use of the land under appraisement, the adequacy of transportation, electricity, water and sewage, the availability of the industrial labor supply, and considered the factor of the reasonable time in connection with the conversion of the property to its best use. He further testified that he considered the highest and best use of the land as industrial use, and that he knew of industries which would be interested in that type of location. He was pressed on cross-examination as to just when an industry might want plaintiffs' land, and testified that he thought at any time within from five to ten years would be considered reasonably near in industrial real estate. Defendant moved that all of the testimony of this witness be stricken out. The motion was overruled.

Ezra E. Beard, a farmer and member of the board of county commissioners, had lived not far from plaintiffs' land since 1906, was familiar with the development of the airport district, and in most cases with the prices paid for land around the airport and at private sales of land to others than the city. He gave it as his opinion the north half of plaintiffs' land was worth $250 per acre and the south half of it $200 per acre. It developed on cross-examination that he gave it a higher price and value than if used for farming purposes, which he placed at $125 per acre, because of its use and availability for airport purposes. On motion of defendant that part of his testimony was stricken out. There is no cross-appeal here and the correctness of that ruling is not before us.

Defendant called real estate men and farmers familiar with the land, who, while they differed somewhat in details, in general it may be said that they testified that the land was worth from $60 to $75 for agricultural purposes, but that it had an additional value because of its location, which made it worth $125 per acre.

The court's instructions, none of which was objected to, properly defined the issues, told the jury plaintiffs were entitled to the fair market value of the land taken, determined according to the most advantageous use which could have been made of it at the time it was condemned unaffected by conditions prior or subsequent thereto, and properly defined terms used. At defendant's request the court gave an instruction properly defining speculative value, and which included the following:

"While the investment value of the land in question may be taken as a criterion for arriving at its fair market value, yet this is true only insofar as evidence as to the investment value is not a matter of guesswork and conjecture. Damages cannot be based upon mere guesswork or conjecture on the part of witnesses. In determining the fair market value of the land in question, you are not to consider fanciful uses to which the land is not naturally adapted, nor are you to consider its value for purposes which are based on speculation."

The court submitted to the jury two special questions which, with their answers, are as follows:

"1. Q. What was the most advantageous use for which the 151-acre tract of the plaintiff was adaptable on May 15, 1943? A. Industrial.

"2. Q. What do you find to be the fair and reasonable market value for the most valuable use to which it was adaptable, of the 151 acres taken by the city of Wichita, as of May 15, 1943. A. $200.00 per acre or $30,200."

Defendant filed a motion to set aside the answer to special question No. 2 and to set aside the verdict and grant a new trial. This motion was considered and overruled and judgment was rendered for plaintiffs on the general verdict, which was in harmony with the answers to the special questions.

Defendant, as appellant in this court, argues that the court permitted incompetent, irrelevant and immaterial testimony and refused to strike the same on motion. The point is not well taken. Defendant made no objection to the testimony of plaintiffs' witnesses Watson and Shaffer. Its only objection to the testimony of the witness Beard was sustained. Its motion to strike out "all of the testimony" of the witness Brady was properly overruled. Aside from the testimony respecting his qualifications he was careful in his direct examination to make it clear that his opinion of the value of the property was of the date of May 15, 1943, and that the property was adaptable to industrial use at that time; that a purchaser for it at that time, or soon thereafter, for such purposes was likely to be found. On his cross-examination he was led into the expression previously set out, which was that in the development of an industrial property within a period of five to ten years would not be unreasonable. But this did not disclose that he was fixing a valuation of the property at five to ten years in the future. He had already fixed it at a previous date.

Appellant's contention that a new trial should have been granted because the verdict of the jury was based on speculative testimony as to value is equally untenable. The court was careful in its in-

structions to guard against any possibility of that. Appellant does not question the rule of law embodied in the court's instructions that plaintiffs were entitled to have the property valued upon the basis of the most valuable use to which it was adaptable. It was the contention of plaintiffs at the trial that such most valuable use was for industries. All of the witnesses called, those for defendant as well as for plaintiffs, testified that it had at the time of the condemnation a value for use in addition to its use for agricultural purposes. Answering special question No. 1, that the most advantageous use for which plaintiffs' land was adaptable was industrial, defendant did not move to set aside that answer. It is not now in position to say that the answer was not sustained by competent, substantial evidence.

The legal principles involved in the proceedings are well established and are not controverted here. Appellant cites and relies heavily upon our decision in *Glover v. State Highway Comm.*, 147 Kan. 279, 292, 77 P. 2d 189. In that case the owner of land condemned for highway purposes testified that when he purchased the land he had in mind that some day he would lay it out as an addition to Kansas City. It was several miles west of the city. Some of the additions to the city, laid out much closer to the city than the land in question, had proved to be too far out to be financially profitable. There was no testimony from any other source that the land then being considered had an added value at the time it was taken by the highway commission because of its location for future platting. The case is not helpful to appellant here. Appellant cites some cases from other states where the suggested added value in the development for industrial purposes was too remote to be taken into account, and the appellees cite a number of cases from other jurisdictions where such matters were taken into account because the evidence disclosed reasons for the added value. We see no purpose in citing and analyzing these cases.

After all, this is largely a fact case. The witnesses had different opinions as to value. The verdict of the jury was not extreme either way. It was approved by the trial court. We find no reason to disapprove it. To do so would be to substitute our judgment for that of the triers of fact.

The judgment of the court below is affirmed.

BURCH, J., not participating.